IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Charlotte N. Sweeney

Civil Action No. 1:23-cv-00479-CNS-NRN

SALIENT POWER SOLUTIONS, LLC, a Colorado limited liability company and
PSI POWER & CONTROLS, LLC

      Plaintiffs,

v.

CULLARI INDUSTRIES, LLC, a converted Colorado limited liability company f/k/a WRS Protection and Control Systems, LLC,
WILLIAM RICHARD STEWART, an individual, and
JENNIFER STEWART, an individual,

      Defendants.

## ORDER

Before the Court is Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 18) (TRO). The Court DENIES the motion for the following reasons.

### I. BACKGROUND[1]

Plaintiff Salient Power Solutions, LLC[2] (Salient) "specializes in design, engineering, and manufacture of custom switchgear for emergency power distribution" in commercial settings (ECF No. 18-1, ¶ 4). In April 2019, Salient hired WRS Protection and Control Systems, LLC[3] (WRS) as an independent contractor to work on various power system design projects (ECF No. 18 at 4). At

---

[1] The following factual allegations are drawn from Plaintiffs' TRO motion and its attached exhibits.
[2] Salient is now a wholly owned subsidiary of its Co-Plaintiff, PSI Power & Controls, LLC (ECF No. 18-1, ¶ 2).
[3] WRS is now known as Cullari Industries, LLC, and is named as such as a Co-Defendant (ECF No. 18-1, ¶ 19).

1

that time, Defendant Bill Stewart owned WRS, and Defendant Jennifer Stewart was a WRS employee (*id.*). As part of the hiring process, Mr. Stewart executed an Independent Contractor Agreement (ICA), which provided that "Contractor will not disclose or use, either during or after the term of this Agreement, any proprietary or confidential information of Client without Client's prior written permission except to the extent necessary to perform services on Client's behalf" (ECF No. 18-3, ¶ 18). The agreement also provided that "[u]pon termination of Contractor's services to Client, or at Client's request, Contractor shall deliver to Client all materials in Contractor's possession relating to Client's business" (*id.*). Later in November 2019, Mr. Stewart became a Salient employee, and he likely[4] entered into a Nondisclosure Agreement (NDA) containing substantially similar provisions regarding the use, disclosure, and retention of Salient's confidential information (ECF No. 18-2, ¶¶ 3, 5).

Salient's "confidential information" at issue in both the ICA and NDA included (i) its compilation of client and vendor information, purchase orders, and information regarding past and prospective projects, pricing, and completion of work, (ii) its proprietary, custom power system designs, and (iii) an algorithm developed by Salient that allows it to use natural gas generators in data centers (ECF No. 18-1, ¶ 16). Because of the high economic value of Salient's confidential information, Salient implemented several security measures to maintain the information's confidentiality (*id.*, ¶¶ 8–13). Mr. Stewart and WRS were granted only limited access to this confidential information as determined by job necessity (*id.*, ¶¶ 12, 21, 27).

---

[4] Salient's human resources file for Bill Stewart has apparently been misplaced, so whether Bill Stewart ever executed this nondisclosure agreement is unknown at present (ECF No. 18 at 4–5).

2

In December 2021, WRS exercised the ICA's termination provision (ECF No. 18 at 6). Three months later, Mr. Stewart emailed Brian Kisner, president of Salient, his resignation letter effective March 31, 2022 (*id.*). Mr. Kisner had since become suspicious of Mr. Stewart's behavior at work, however, and following a meeting, Mr. Stewart was escorted off company premises on March 30, 2022 (*id.*).

After Mr. Stewart was removed from Salient's premises, Mr. Kisner accessed Mr. Stewart's company-owned desktop and laptop computers, discovering that:

- Mr. Stewart had deleted or archived more than 3,900 work emails prior to his termination. These emails showed that Mr. Stewart had communicated with Salient customers—using his Salient email address along with Salient's logos and marks—to divert Salient's business to WRS and reduce Salient's scope of work on existing projects (ECF No. 18 at 7–8, 11).
- During the period immediately prior to his departure from Salient, Mr. Stewart had copied data files containing Salient's confidential information—including trade secrets that he did not have authority to access—onto several USB hard drives and his personal OneDrive account (*id.* at 8–9).
- Mr. Stewart had also irretrievably destroyed data files containing Salient's confidential information using a "shredder program," copied Salient's human resources files onto his personal OneDrive account, and accessed a "master sheet" of Salient's login credentials belonging to Mr. Kisner (*id.*).

Following his departure from Salient, Mr. Stewart became employed in a substantially similar position at UIG (ECF No. 18 at 3). Through counsel, Salient has sent a letter to Mr. Stewart and WRS demanding the return of any confidential information, and a letter to UIG demanding

3

that it confirm that it is not using Salient's trade secrets in the course of its business, neither of which have been answered to Salient's satisfaction (*see* ECF Nos. 18-8, 18-10). Salient now claims that, "[i]n view of the Stewart Defendants' silence on this issue, as well as the likely overlap between Bill Stewart's last position for Salient and his new position with UIG, the Stewart Defendants have disclosed and will continue to disclose Salient's confidential information and trade secrets for the benefit of WRS and/or UIG" (ECF No. 18 at 11).

On February 21, 2021, Plaintiffs filed suit alleging violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*; the Colorado Uniform Trade Secrets Act, C.R.S. § 7-74-101, *et seq.*; and the Computer Fraud and Abuse Act, 18 U.S.C § 1030, *et seq.* (*see* ECF No. 1, ¶¶ 94–140). Plaintiffs also alleged claims of Negligence *Per Se*, C.R.S. § 18-5.5-102; False Association and Unfair Competition under the Lanham Act, 15 U.S.C. § 1051, *et seq.*; Intentional Interference with Business Relations; Breach of Loyalty; Civil Theft, C.R.S. § 18-4-405; Unfair Competition; and Civil Conspiracy; and preliminary and permanent injunctive relief (*see id.*, ¶¶ 141–206).

Three months later, on May 17, 2023, Plaintiffs filed the instant TRO motion seeking to restrain Defendants from (i) "using, disclosing, divulging, transferring, or distributing with others Salient's confidential and proprietary information," and (ii) "retaining any copies of Salient's confidential and proprietary information" (*see* ECF No. 18-12, ¶¶ 5–6).

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 65 authorizes the court to enter preliminary injunctions and issue temporary restraining orders. Fed. R. Civ. P. 65(a), (b). "The requirements for issuing a [temporary restraining order] mirror the requirements for issuing a preliminary injunction." *Briscoe v. Sebelius*, 927 F. Supp. 2d 1109, 1114 (D. Colo. 2013). A party seeking preliminary

4

injunctive relief must satisfy four factors: (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest. *Petrella v. Brownback*, 787 F.3d 1242, 1257 (10th Cir. 2015). A party seeking an injunction must demonstrate that "all four of the equitable factors weigh in its favor," *Sierra Club, Inc. v. Bostick*, 539 F. App'x 885, 888 (10th Cir. 2013), and a "plaintiff's failure to prove any one of the four preliminary injunction factors renders its request for injunctive relief unwarranted." *Vill. of Logan v. U.S. Dep't of Interior*, 577 F. App'x 760, 766 (10th Cir. 2014). "Preliminary injunctions are extraordinary remedies requiring that the movant's right to relief be clear and unequivocal." *Planned Parenthood of Kan. v. Andersen*, 882 F.3d 1205, 1223 (10th Cir. 2018).

### III. ANALYSIS

In their TRO motion, Plaintiffs argue that "[i]mmediate injunctive relief is necessary to enjoin Defendants from misappropriating Plaintiffs' trade secrets" and misusing its marks in commerce (ECF No. 18 at 11; *see id.* at 12–29). Among other arguments, Defendants counter that "Plaintiffs cannot show a risk of imminent or irreparable harm in the absence of a TRO, considering Plaintiffs comfortably waited 413 days to file" their TRO motion following Mr. Stewart's termination from Salient (ECF No. 28 at 1 (emphasis omitted); *see id.* at 1–2, 14–16). Ultimately, based on the timing of the TRO motion's filing, the Court agrees with Defendants.

Based on the facts set forth in the TRO motion, Mr. Kisner "had become suspicious of [Mr.] Stewart's behavior at work" in March 2022, right around the time Mr. Stewart had given notice of his intent to resign from Salient (*see* ECF No. 18 at 6). Mr. Stewart was then terminated from Salient and escorted off company premises on March 30, 2022 (*id.* at 6–7). But despite Mr.

5

Kisner's "suspicion," and after examining Mr. Stewart's company-owned computers and learning of Mr. Stewart's alleged misconduct, Plaintiffs did not file their original complaint until February 21, 2023—nearly a full year after Mr. Stewart's termination (*see* ECF No. 1). More importantly, Plaintiffs did not file this TRO motion until May 17, 2023—nearly three months after they initiated this lawsuit (*see* ECF No. 18).

"[D]elay is an important consideration in the assessment of irreparable harm" for purposes of injunctive relief. *GTE Corp. v. Williams*, 731 F.2d 676, 679 (10th Cir. 1984). Here, although Plaintiffs contend that they will be irreparably harmed unless an injunction issues against Defendants' use of Salient's confidential information and trademarks, their considerable three-month delay in filing this TRO motion "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury.'" *Id.* at 678 (quoting *Le Sportsac, Inc. v. Dockside Research, Inc.*, 478 F. Supp. 602, 609 (S.D.N.Y.1979)); *see* 6 McCarthy on Trademarks and Unfair Competition § 31:32 (5th ed.) ("It has often been held that unreasonable delay in filing suit and/or in moving for a preliminary injunction can contribute to a defeat of a motion for preliminary injunction . . . for the reason that delay negates the moving party's ability to show the kind of 'irreparable injury' needed for preliminary relief.").

Courts in both this jurisdiction and others have similarly determined that a movant's delay in seeking injunctive relief warranted the denial of injunctive relief. *See Harley's Hope Foundation v. Harley's Dream*, No. 22-cv-0136-WJM-STV, 2022 WL 1154526, at *3 (D. Colo. Apr. 19, 2022) (collecting cases); *see also Colo. Mont. Wyo. State Area Conf. of the NAACP v. United States Election Integrity Plan*, No. 22-cv-00581-PAB, 2022 WL 1061906, at *5 (D. Colo. Apr. 8, 2022) (waiting three months to file motion for emergency injunctive relief without explanation "strongly

undermines plaintiff's suggestion that the moment of maximum harm is now at hand") (citation omitted); *Oakland Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."); *Cheng v. Dispeker*, No. 94 CIV. 8716 (LLS), 1995 WL 86353, at *6 (S.D.N.Y. Mar. 2, 1995) ("[P]laintiffs waited five more months before moving for a preliminary injunction. Such a delay vitiates plaintiffs' assertion that they will be irreparably harmed if a preliminary injunction is not entered."); 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.) ("A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction.") (citations omitted).

The Court finds the reasoning of the above authorities to be persuasive. At bottom, Plaintiffs' "unwarranted delay in seeking this injunction belies [its] contention of irreparable harm and defeats its motion for preliminary injunction." *Ixmation, Inc. v. Switch Bulb Co., Inc*., No. 14-CV-6993, 2014 WL 5420273, at *7 (N.D. Ill. Oct. 23, 2014). Under these circumstances, granting a TRO in Plaintiff's favor would be inappropriate.

## IV.  CONCLUSION

For the foregoing reasons, Plaintiffs' TRO motion is DENIED (ECF No. 18).

DATED this 6th day of June 2023.

BY THE COURT:

_____
Charlotte N. Sweeney
United States District Judge